IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ELTON LEROY PUMPHREY,              )
                                   )
                    Petitioner,    )
                                   )
        v.                         )    C.A. No. 22-24 (MN)
                                   )
BRIAN EMIG, Warden, and ATTORNEY   )
GENERAL OF THE STATE OF            )
DELAWARE,                          )
                                   )
                    Respondents.[1] )

## **MEMORANDUM OPINION**[2]


Elton Leroy Pumphrey  – *Pro se* Petitioner.

Elizabeth McFarlan, Deputy Attorney General, Delaware Department of Justice, Wilmington, DE – Attorney for Respondents.


September 29, 2025
Wilmington, Delaware

---

[1]     The Court has substituted Warden Brian Emig for former Warden Robert May, an original party to the case.  *See* Fed. R. Civ. P. 25(d).

[2]     This case was reassigned to the undersigned's docket on January 31, 2024.

*Maryellen Noreika*

**NOREIKA, U.S. DISTRICT JUDGE**

Pending before the Court is a Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 ("Petition") filed by Petitioner Elton Leroy Pumphrey ("Petitioner"). (D.I. 2). The State filed an Answer in opposition, to which Petitioner filed a Reply. (D.I. 15; D.I. 26). For the reasons discussed, the Court will deny the Petition.

## I.    BACKGROUND

On November 21, 2016, Lessig received a call from his granddaughter notifying him that the water heater in her manufactured trailer home, which she rented from Lessig, had malfunctioned. She also stated that there was a man looking at the water heater who wanted to speak with Lessig. When Lessig arrived at the home in the Cool Springs Farms development, he saw his grandson standing outside the home along with three other men. Inside the home, one of the men—later identified as [Petitioner]— offered to repair the water heater for $40. Lessig declined the offer and walked outside toward his two-seat Mazda Miata. At this point, the parties' stories diverge.

The State alleges that [Petitioner] asked Lessig for a ride, and, with Lessig's permission, he entered the car and gave directions as Lessig drove. After Lessig turned onto a cul-de-sac and asked [Petitioner] where he lived, [Petitioner] pulled the keys out of the ignition and twice threatened to rob Lessig—once grabbing him by the face. Lessig gave [Petitioner] his empty wallet and told him that he had no money. [Petitioner] then took Lessig's keys and mobile phone as he exited the car. Lessig also left the car and approached a man nearby who let him use his cell phone to call the police. During that time, [Petitioner] got back into Lessig's car and drove away. The bystander stayed with Lessig until Trooper Murray, the responding police officer, arrived.

Murray canvassed the neighborhood and asked a local resident if he had heard who committed the crime. The resident began pronouncing a word starting with "B," but was unable to think of the full name. Murray then suggested that it might be "Boyer," a name affiliated with crime in the Cool Springs Farms area, which

1

the resident confirmed. Murray included the possible "Boyer" suspect in his contemporaneous notes. The next day, Detective Doughty took over the investigation and reviewed Murray's police report. Doughty thought that the section of the report concerning Boyer was vague, so he emailed Murray instructing him to "clean it up."

Police also interviewed Lessig's grandson, who said that "Bowl" was the man inside the trailer home looking at the hot water heater. Another individual in the Cool Springs Farms development told Doughty that "Bowl" was [Petitioner's] nickname. Lessig described the perpetrator as a black male between 6'2" to 6'4" and 200 to 210 pounds. Lessig's grandson provided a similar description of the man looking at the water heater, describing him as a black male who was 6'4" to 6'5", 220 to 230 pounds, and appeared to be in his forties.

After obtaining [Petitioner's] name, Doughty created a six-photo lineup using [Petitioner's] mugshot and pictures of men of similar appearance. Doughty did not pursue an investigation of "Boyer" because he did not fit the general description of the suspect. Further, the trial court found that there was no evidence that Boyer was in the area at the time of the offense.

Doughty conducted the photo identification at Lessig's trailer home two days after the incident occurred, which he audiotaped in its entirety. First, Doughty presented the photo lineup to Lessig's grandson, who identified [Petitioner] "with not a doubt in [his] mind," "110%" as "the person who jacked my pop." Doughty then presented the photo lineup to Lessig in the kitchen, while his grandson remained in the living room. Lessig told Doughty that he was not certain he could identify the perpetrator. Lessig's grandson can be heard on the audiotape encouraging him to look at the photo lineup. Doughty explained that the perpetrator was not necessarily in the lineup and that, if Lessig did not see him, he should not feel compelled to make an identification. Doughty then showed Lessig the photo lineup and Lessig identified [Petitioner] as the perpetrator, although he told Doughty that he did not think [Petitioner] wore glasses during the incident, as [Petitioner] did in his mugshot.

2

> Doughty obtained an arrest warrant for [Petitioner], who turned himself in the same day. In his interview with Doughty, [Pumphrey] offered a different account of the events. He admitted that he was in the trailer home with Lessig and Lessig's grandson to examine the water heater, that he drove the car after borrowing it from Lessig, purchased liquor while driving the car, and later abandoned the car on the side of the road after it broke down without notifying Lessig. He further asserted that those events took place the day after Lessig was carjacked by a different person.

*Pumphrey v. State*, 204 A.3d 828 (Table), 2019 WL 507672, at*1-2 (Del. Feb 8, 2019).

In January 2017, a Sussex County grand jury issued an indictment charging Petitioner with first-degree carjacking (11 Del. C. § 836(a)(6)), first degree robbery (11 Del. C. § 832(a)(4)), and offensive touching (11 Del. C. § 601). In May 2017, Petitioner filed a motion *in limine* to exclude identification evidence, which the Superior Court denied. (D.I. 14-1 at 23, 28, 29, 30). During his June 2017 trial, Petitioner filed a motion for judgment of acquittal, which the Superior Court denied. (D.I. 14-1 at Entry No. 31). On June 14, 2017, the Superior Court jury found Petitioner guilty of all three charges. (D.I. 14-1 at Entry No. 35); *see Pumphrey*, 2019 WL 507672, at *3. Thereafter, Petitioner filed an amended motion for judgment of acquittal based on alleged improper identification and a motion for new trial based on an alleged *Brady* violation. *See id*. The Superior Court denied both motions. *See id*. On February 9, 2018, the Superior Court sentenced Petitioner as follows: for first degree robbery, as a habitual offender to thirteen years at Level V incarceration (with credit for time served); for first degree carjacking, to twenty-five years at Level V incarceration, suspended after three years for twelve years of Level III probation; and for offensive touching, to thirty days at Level V, suspended for six months at Level IV work release. (D.I. 15-15 at 119-125).

Petitioner appealed. The State conceded that Petitioner's offensive touching conviction was erroneous because is a lesser-included offense of first-degree robbery. *See Pumphrey*, 2019

WL 507672, at *1.  The Delaware Supreme Court affirmed Petitioner's convictions for robbery and carjacking and vacated the offensive touching conviction.  *See id*. at *6.  The Superior Court resentenced Petitioner on March 26, 2029, changing the original sentence only by eliminating the offensive touching portion of the sentence and correcting the amount of time served.  (D.I. 14-14 at 229-36).

On June 10, 2019, Petitioner filed a pro se motion for postconviction relief pursuant to Delaware Superior Court Criminal Rule 61 ("Rule 61 motion") and a motion to appoint counsel. (D.I. 14-1 at Entry Nos. 103, 104).  The Superior Court granted the motion to appoint counsel, and appointed counsel filed an amended Rule 61 motion in June 2020.  (D.I. 14-1 at Entry No. 109, 111; D.I. 14-14 at 333-345).   The Superior Court denied the amended Rule 61 motion on October 19, 2020, and the Delaware Supreme Court affirmed that judgment on May 19, 2021.  *See Pumphrey,* 2020 WL 6132294, at *9 (Del. Super. Ct. Oct. 19, 2020); *Pumphrey v. State*, 2021 WL 1997957, at *1 (Del. May 19, 2021).

## II.    GOVERNING LEGAL PRINCIPLES

### A.    The Antiterrorism and Effective Death Penalty Act of 1996

Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "to reduce delays in the execution of state and federal criminal sentences . . . and to further the principles of comity, finality, and federalism." *Woodford v. Garceau*, 538 U.S. 202, 206 (2003). Pursuant to AEDPA, a federal court may consider a habeas petition filed by a state prisoner only "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  AEDPA imposes procedural requirements and standards for analyzing the merits of a habeas petition in order to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

B.    **Exhaustion and Procedural Default**

Absent exceptional circumstances, a federal court cannot grant habeas relief unless the petitioner has exhausted all means of available relief under state law.  *See* 28 U.S.C. § 2254(b); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842-44 (1999); *Picard v. Connor*, 404 U.S. 270, 275 (1971). AEDPA states, in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that –
>
> (A) the applicant has exhausted the remedies available in the courts of the State; or
>
> (B)(i)  there is an absence of available State corrective process; or
>      (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1).

The exhaustion requirement is based on principles of comity, requiring a petitioner to give "state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."  *O'Sullivan*, 526 U.S. at 844-45; *Werts v. Vaughn*, 228 F.3d 178, 192 (3d Cir. 2000).  A petitioner satisfies the exhaustion requirement by demonstrating that the habeas claims were "fairly presented" to the state's highest court, either on direct appeal or in a post-conviction proceeding, in a procedural manner permitting the court to consider the claims on their merits.  *See Bell v. Cone*, 543 U.S. 447, 451 n.3 (2005); *Castille v. Peoples,* 489 U.S. 346, 351 (1989).

A petitioner's failure to exhaust state remedies will be excused, and the claims treated as "technically exhausted", if state procedural rules preclude him from seeking further relief in state courts.  *See Coleman v. Thompson*, 501 U.S. 722, 732, 750-51 (1991) (such claims "meet[] the technical requirements for exhaustion" because state remedies are no longer available); *see also*

*Woodford v. Ngo*, 548 U.S. 81, 92-93 (2006). Although treated as technically exhausted, such claims are procedurally defaulted for federal habeas purposes. *See Coleman*, 501 U.S. at 749 (1991); *Lines v. Larkins*, 208 F.3d 153, 160 (3d Cir. 2000). Similarly, if a petitioner presents a habeas claim to the state's highest court, but that court "clearly and expressly" refuses to review the merits of the claim due to an independent and adequate state procedural rule, the claim is exhausted but procedurally defaulted. *See Coleman*, 501 U.S. at 750*; Harris v. Reed*, 489 U.S. 255, 260-64 (1989). Federal courts may not consider the merits of procedurally defaulted claims unless the petitioner demonstrates either cause for the procedural default and actual prejudice resulting therefrom, or that a fundamental miscarriage of justice will result if the court does not review the claims. *See McCandless v. Vaughn,* 172 F.3d 255, 260 (3d Cir. 1999); *Coleman,* 501 U.S. at 750-51. To demonstrate cause for a procedural default, a petitioner must show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). To demonstrate actual prejudice, a petitioner must show that the errors during his trial created more than a possibility of prejudice; he must show that the errors worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.* at 494.

Alternatively, if a petitioner demonstrates that a "constitutional violation has probably resulted in the conviction of one who is actually innocent," *Murray*, 477 U.S. at 496, then a federal court can excuse the procedural default and review the claim in order to prevent a fundamental miscarriage of justice. *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Wenger v. Frank*, 266 F.3d 218, 224 (3d Cir. 2001). The miscarriage of justice exception applies only in extraordinary cases, and actual innocence means factual innocence, not legal insufficiency. *See Bousley v. United States*, 523 U.S. 614, 623 (1998); *Murray*, 477 U.S. at 496. A petitioner

establishes actual innocence by asserting "new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial," showing that no reasonable juror would have voted to find the petitioner guilty beyond a reasonable doubt. *Hubbard v. Pinchak*, 378 F.3d 333, 339-40 (3d Cir. 2004); *see also Reeves v. Fayette SCI*, 897 F.3d 154, 157 (3d Cir. 2018).

C.    <u>Standard of Review</u>

When a state's highest court has adjudicated a federal habeas claim on the merits, the federal court must review the claim under the deferential standard contained in 28 U.S.C. § 2254(d).[3] Pursuant to 28 U.S.C. § 2254(d), federal habeas relief may only be granted if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States," or the state court's decision was an unreasonable determination of the facts based on the evidence adduced in the state court proceeding. 28 U.S.C. § 2254(d)(1) & (2); *see Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001). The deferential standard of § 2254(d) applies even when a state court's order is unaccompanied by an opinion explaining the reasons relief has been denied. *See Harrington v. Richter*, 562 U.S. 86, 98-101 (2011). As explained by the Supreme Court, "it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id.* at 99.

A state court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially

---

[3]    A claim has been "adjudicated on the merits" for the purposes of 28 U.S.C. § 2254(d) if the state court decision finally resolves the claim on the basis of its substance, rather than on a procedural or some other ground. *See Thomas v. Horn*, 570 F.3d 105, 115 (3d Cir. 2009).

indistinguishable facts." *Williams*, 529 U.S. at 413. The mere failure to cite Supreme Court precedent does not require a finding that the decision is contrary to clearly established federal law. *See Early v. Packer*, 537 U.S. 3, 8 (2002). For instance, a decision may comport with clearly established federal law even if the decision does not demonstrate an awareness of relevant Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Id*. In turn, an "unreasonable application" of clearly established federal law occurs when a state court "identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of a prisoner's case." *Williams*, 529 U.S. at 413; *see also White v. Woodall*, 572 U.S. 415, 426 (2014).

When performing an inquiry under § 2254(d), a federal court must presume that the state court's determinations of factual issues are correct. *See* 28 U.S.C. § 2254(e)(1); *Appel*, 250 F.3d at 210. This presumption of correctness applies to both explicit and implicit findings of fact and is only rebutted by clear and convincing evidence to the contrary. *See* 28 U.S.C. § 2254(e)(1); *Campbell v. Vaughn*, 209 F.3d 280, 286 (3d Cir. 2000); *Miller-El v. Cockrell*, 537 U.S. 322, 341 (2003) (stating that the clear and convincing standard in § 2254(e)(1) applies to factual issues, whereas the unreasonable application standard of § 2254(d)(2) applies to factual decisions). State court factual determinations are not unreasonable "merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010).

### D.    Ineffective Assistance of Counsel

In order to establish a claim of ineffective assistance of counsel, a petitioner must satisfy the two-pronged standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984) and its progeny. *See Wiggins v. Smith*, 539 U.S. 510 (2003); *United States v. Scripps*, 961 F.3d 626, 632 (3d Cir. 2020). Under the first *Strickland* prong, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness," with reasonableness being

judged under professional norms prevailing at the time counsel rendered assistance. *Strickland*, 466 U.S. at 688. Although not insurmountable, the *Strickland* standard is highly demanding and leads to a "strong presumption that the representation was professionally reasonable." *Strickland*, 466 U.S. at 689. Under the second *Strickland* prong, a petitioner must demonstrate that "there is a reasonable probability that, but for counsel's error the result would have been different." *Id.* at 687-96. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Id.* at 688. In order to sustain an ineffective assistance of counsel claim, a petitioner must make concrete allegations of actual prejudice and substantiate them or risk summary dismissal. *See Wells v. Petsock*, 941 F.2d 253, 259-60 (3d Cir. 1991); *Dooley v. Petsock*, 816 F.2d 885, 891-92 (3d Cir. 1987). A court may choose to address the prejudice prong before the deficient performance prong and may reject an ineffectiveness claim solely on a petitioner's failure to satisfy one prong of the *Strickland* standard. *See Strickland*, 466 U.S. at 668. If the state court only addresses one prong of the *Strickland* test without addressing the merits of the other prong, and the federal court decides to consider the unaddressed prong, the federal court's review of the unaddressed prong must be *de novo*. *See, e.g., Porter v. McCollum*, 558 U.S. 30, 39 (2009) ("Because the state court did not decide whether Porter's counsel was deficient, we review this element of Porter's *Strickland* claim *de novo*."); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (applying *de novo* review where state courts did not reach prejudice prong under *Strickland*).

In *United States v. Cronic*, 466 U.S. 648 (1984), the United States Supreme Court articulated a very limited exception to *Strickland*'s requirement that a petitioner must demonstrate both deficient performance and prejudice in order to prevail on an ineffective assistance of counsel claim, holding that there are three situations in which prejudice caused by an attorney's performance will be presumed: where the defendant is completely denied counsel at a critical

stage; where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing"; or where the circumstances are such that there is an extremely small likelihood that even a competent attorney could provide effective assistance, such as when the opportunity for cross-examination has been eliminated. *Cronic*, 466 U.S. at 659 & n.25. The *Cronic* presumption of prejudice only applies when counsel has completely failed to test the prosecution's case throughout the entire proceeding. *See Bell v. Cone*, 535 U.S. 685, 697 (2002). This presumption of prejudice is sometimes referred to as "*per se*" ineffective assistance of counsel. *See Thomas v. Horn*, 750 F.3d 105, 113 n.3 (3d Cir. 2009).

## III.    **DISCUSSION**

Petitioner's timely filed Petition asserts the following eight Claims for relief: (1) the trial court violated Petitioner's due process rights by refusing to exclude Lessig's impermissibly suggestive pretrial identification which, in turn, tainted Lessig's in-court identification, and trial counsel was ineffective for failing to challenge the identification (D.I. 4 at 1-2); (2) the State violated *Brady v. Maryland*, 373 U.S. 83 (1963) by suppressing evidence of another suspect named "Boyer", and a related ineffective assistance of trial counsel claim for failing to challenge the identification (D.I. 4 at 3); (3) the trial court failed to exclude Detective Doughty's comments during the witness's videotaped statement, resulting in improper vouching by the State (D.I. 4 at 4-5); (4) trial counsel provided ineffective assistance by filing to redact or object to the admission of Petitioner's statement (D.I. 4 at 5-6); (5) trial counsel provided ineffective assistance during his opening statement by revealing to the jury that Petitioner had a criminal record (D.I. 4 at 607); (6) trial counsel's trial strategy was unreasonable and prejudicial (D.I. 4 at 8-9); (7) trial counsel provided ineffective assistance by not challenging Lessig's suggestive pre-trial identification (D.I. 4 at 3); (8) trial counsel provided ineffective assistance by not challenging the pre-trial identification and reference to "Boyer" (D.I. 4 at 5); (9) appellate and postconviction counsel

provided ineffective assistance by failing to raise a conflict of interest claim regarding trial counsel's representation (D.I. 4 at 11-14); and (10) the cumulative effect of trial counsel's errors prejudiced Petitioner (D.I. 4 at 9-11).

A.    **Claim One: Due Process Violation**

In Claim One, Petitioner contends that the trial court violated his due process rights by admitting Lessig's pre-trial out-of-court photo identification of Petitioner, because that identification was impermissibly suggestive and tainted Lessig's in-court identification. Petitioner presented this argument to the Delaware Supreme Court on direct appeal, which denied it as meritless. *See Pumphrey*, 2019 WL 507672, at *3-4. Given these circumstances, Claim One will only warrant relief if the Delaware Supreme Court's decision was either contrary to, or an unreasonable application of, clearly established federal law.

Claims involving in-court and out-of-court identifications are governed by the standard of "fairness as required by the Due Process Clause of the Fourteenth Amendment." *Manson v. Brathwaite*, 432 U.S. 98 (1977). Two landmark Supreme Court cases, *Manson* v. *Brathwaite* (*Id.*), and *Neil v. Biggers*, 409 U.S. 188 (1972), provide the framework for this analysis. In *Biggers*, the Supreme Court set out a two-step inquiry for assessing the constitutionality of a trial court's decision to admit out-of-court identifications. *See id.* at 196-200 (1972). First, the court must determine if the challenged pre-trial identification procedure was impermissibly suggestive. *See Biggers*, 409 U.S. at 196-97; *Simmons v. United States*, 390 U.S. 377, 384 (1968). If the first step is answered affirmatively, then the court must determine whether, under the totality of the circumstances using five factors set forth in *Biggers*, the identification was nonetheless reliable. *See Biggers*, 409 U.S. at 198-200; *Perry v. New Hampshire*, 565 U.S. 228, 239-40 (2012). Those factors include: "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of

11

certainty demonstrated at the confrontation, and the time between the crime and the confrontation." *Biggers*, 409 U.S. at 199-200.  Conversely, if the reviewing court finds that the identification procedure was not unduly suggestive, then the admission of the out-of-court identification did not violate the defendant's due process rights.  In such cases, the "reliability of properly admitted eyewitness identification, like the other parts of the prosecution's case, is a matter for the jury." *Foster v. California*, 394 U.S. 440, 443 n.2 (1969); *see Manson,* 432 U.S. at 116; *Perry*, 565 U.S. at 240-42.

In *Manson*, the Supreme Court applied the *Biggers* factors, as well as the absence of any coercive pressure to positively identify the photograph, to conclude there was not a "very substantial likelihood of irreparable misidentification." *Id*. at 116.  The *Manson* Court emphasized that reliability is the linchpin in determining the admissibility of identification testimony.

Turning to the first prong of the § 2254(d)(1) inquiry, a "state court decision is contrary to clearly established federal law if it applies a rule that contradicts the governing law set forth in Supreme Court precedent, or if it confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from that reached by the Supreme Court." *Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013).  In Petitioner's case, the Delaware Supreme Court decision was not contrary to clearly established federal law because the state court correctly identified *Manson* and the five *Diggers* factors applicable to Claim One. *See Pumphrey*, 2019 WL 507672, at *4; *Williams*, 529 U.S. at 406 ("[A] run-of-the-mill state-court decision applying the correct legal rule from [Supreme Court] cases to the facts of a prisoner's case [does] not fit comfortably within § 2254(d)(1)'s 'contrary to' clause").

The Court must also determine if the Delaware Supreme Court reasonably applied the standards established in *Manson* and *Diggers* to the facts of Petitioner's case. The Delaware Supreme Court denied Claim One as meritless, explaining:

> As the trial court recognized, the identification process was not pristine. Lessig's grandson was in the home when Lessig identified Pumphrey, and the grandson even suggested to Lessig that he should identify the perpetrator if he sees him. The complete recording of the identification process, however, reveals that the grandson did not suggest a specific person out of the lineup or give any known hints. Further, Doughty explained to Lessig that the perpetrator was not necessarily in the photographic lineup and that he should not feel compelled to identify anyone if he did not recognize the perpetrator. Thus, although it was imperfect, the identification process was not impermissibly suggestive.
>
> Even assuming, *arguendo*, that the identification process was impermissibly suggestive, it did not give rise to a substantial likelihood of irreparable misidentification. We look to the five factors in *Manson v. Brathwaite* to determine the likelihood of irreparable misidentification: "(1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation." Here, the *Manson* factors support the trial court's admission of the pre-trial identification. Both Lessig and his grandson interacted with [Petitioner] in close quarters and accurately described [Petitioner's] physical characteristics. Further, Lessig's grandson identified with "110%" certainty that [Petitioner] was the perpetrator, while Lessig himself identified [Petitioner] out of the same photographic array. Finally, only two days elapsed between the incident and the identification of [Petitioner] in the photographic lineup. Thus, we agree with the trial court that "nothing in the manner in which the grandfather exercised his determination of whether the perpetrator was in that lineup that was unnecessarily suggestive or created a risk of misidentification." Accordingly, the [Superior] Court did not abuse its discretion in denying [Petitioner's] motion to suppress the identification. But

even if it had, given the overwhelming evidence, any error in the
identification procedure was harmless.

*Pumphrey*, 2019 WL 507672, at *4.

Prior to trial, Petitioner filed a motion to exclude the identification evidence. The Superior

Court held a hearing and denied the motion after making the following factual finding:

> Based on all of the circumstances and considering the facts, as
> presented; listening to the audiotape, I'm satisfied that there is no
> unnecessarily suggestive conduct on the part of the police or any
> circumstances that would create a question of reliability beyond that
> whichever you may challenge but nothing to indicate that someone
> advised the victim who to pick out of the lineup; which picture to
> pick; suggested anybody who did the crime was in there. And so
> I'm not satisfied that the grandfather's identification should be
> suppressed. And both the out-of-court identification will be
> permitted.

(D.I. 14-2 at 97-98). On direct appeal, the Delaware Supreme Court reviewed the circumstances

surrounding the identification and found that, while imperfect, the process was not impermissibly

suggestive. *See Pumphrey*, 2019 WL 507672, at *4.

Given Petitioner's failure to provide clear and convincing evidence to the contrary, the

Court presumes the correctness of the Delaware state courts' findings of fact. *See* 28 U.S.C.

§ 2254(e)(1). Consequently, the Court cannot conclude that the identification process was unduly

suggestive.

Further, as the Delaware Supreme Court found, even if the identification process had been

impermissibly suggestive, the identification was reliable under the totality of the circumstances

using the five factors set forth in *Manson* (and *Biggers*). For instance, Lessing had an extended

amount of time to observe Petitioner inside the home, outside the home, and in the car. Lessig's

grandson also interacted with Petitioner in the home. Lessig's initial description of the suspect

matched Petitioner's general description. Lessig's grandson identified Petitioner as the perpetrator

14

with "110%" certainty, and Lessig identified Petitioner immediately and with certainty when he saw Petitioner's photo in the photo array. Finally, Lessig made the identification within two days of the crimes.

Based on the foregoing, the Court finds that the Delaware courts' rejection of the identification argument in Claim One did not involve an unreasonable application of *Manson* and *Biggers*. Therefore, the Court will deny Claim One.

      **B.**    <u>**Claim Two:**  *__Brady__* <u>**Violations**</u></u>

In Claim Two, Petitioner asserts that the State committed two *Brady* violations relating to the identification of Boyer as a possible suspect. Looking to Petitioner's state court filings for further information, the Court construes Petitioner's contention to be that: (1) the State failed to disclose Trooper Murray's contemporaneous notes of his interview with a local resident, during which Trooper Muray suggested the name "Boyer" as a possible suspect in the carjacking; and (2) the State failed to disclose an email from Detective Doughty to Trooper Murray instructing Murray to clean up the section of his police report concerning Boyer. *See Pumphrey*, 2019 WL 507672, at \*5. The Delaware Supreme Court denied the allegations in Claim Two as meritless. Thus, the Court will review the Delaware Supreme Court's denial of Claim Two under § 2254(d)(1).

In *Brady v. Maryland*, the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. This "duty to disclose such evidence is applicable even though there has been no request by the accused," and includes "impeachment evidence as well as exculpatory evidence." *Strickler v. Greene*, 527 U.S. 263, 280 (1999). "Such evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the

proceeding would have been different." *Id*. "In order to comply with *Brady*, therefore, the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police." *Id*. at 281 (cleaned up). "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Id*. at 281-82.

In his motion for new trial, Petitioner argued that the information about Boyer as a possible suspect was revealed during the motion in limine hearing and trial, which was a surprise to him. (D.I. 14-6 at 81).  In his motion for judgment of acquittal, Petitioner argued that Detective Doughty's email to Officer Murray telling him to "clean up" his description of a suspect constituted *Brady* material that was not disclosed to the defense prior to trial.  (D.I. 14-14 at 35-39).  The Superior Court denied the motion for new trial during an office conference in September 2017, explaining:

> So [Petitioner] has not claimed any newly discovered evidence except to the extent that he argues he was not aware of email communications between the two officers.  One of the officers, Officer Murray, had disposed of his notes taken contemporaneously with the investigation prior to trial.

> The officers testified about the email communication at trial. Detective Doughty stated he had asked Trooper Muray, the initial officer, to expand on the information in his report, to, quote, clean it up, or clarify who provided what information about a person named Boyer.  Apparently Trooper Murray did so.

> The defense fully explored the content of the emails, the reasons for them, and effectively argued to the jury that there was another suspect and that the police failed to pursue the possibility that person committed the offense charged.

The Court does not find that the information is newly discovered. The fact that there was an inquiry into another subject [is] referenced in the police report.  Further, Trooper Murray testified all the information in his notes was contained in his report. The State cannot produce, nor could the defense, any evidence to the contrary that might be considered new discovery.

. . . Even if the motion [for new trial] were timely filed, the circumstances of this case would not warrant a new trial.  The evidence was significantly overwhelming.

. . . Now on the motion for judgment of acquittal . . . I did ask the State to provide the email communication for me to review in camera.

. . . So it appears that the content of the emails, as I recall it, was fully explored at the trial.  It's consistent with – it is consistent with the trooper's testimony that he said the name Boyer and Mr. [] said the letter B.

So I wanted to share that because I do think technically it is *Brady* because they are looking for the name of another person who might have committed the crime.

(D.I. 14-6 at 102-107).  The Superior Court denied the motion for judgment of acquittal on December 21, 2017 after determining the evidence was overwhelming and sufficient to support the jury's verdict.  (D.I. 14-14 at 94-95).

The Delaware Supreme Court agreed with the findings of the Superior Court with respect to Petitioner's *Brady* argument, opining:

The Superior Court found that defense counsel "fully explored" the email contents during the officers' testimony and "effectively argued to the jury that there was another suspect" that the police decided not to pursue.  Murray also testified at trial that he included in his report all of the information from his notes, and neither party could show evidence to the contrary. Moreover, the trial court found that the evidence against [Petitioner] "was *significantly overwhelming*." [Petitioner] himself admitted in his interview with Doughty, which was introduced at trial, that he was at the trailer home, looked at the hot water heater with Lessig, drove Lessig's vehicle—although he claims it was with permission—and then abandoned the vehicle after purchasing a bottle of liquor found in

the abandoned car. Additionally, Lessig and his grandson described
[Petitioner] similarly and identified [Petitioner] out of a six-photo
lineup. Thus, we agree with the Superior Court's findings and
conclude that [Petitioner's] *Brady* violations are meritless.

*Pumphrey*, 2019 WL 507672, at *5 (emphasis in original).

After reviewing the record, the Court finds that the Delaware Supreme Court did not
unreasonably apply *Brady* in denying Claim Two.  The State provided Petitioner with police
reports during discovery approximately two months before trial.  (D.I. 14-6 at 4-6).  Petitioner
could have investigated the reference to "Boyer" that was included in Trooper Murray's report,
(D.I. 14-6 at 4-6; D.I. 14-6 at 21-23), and trial counsel actually mentioned the name "Kevin Boyer"
when cross-examining Trooper Murray during the pre-trial motion hearing (D.I. 14-2 at 22)
During the pre-trial motion hearing, Trooper Murray testified that he could not find his notes of
his interview of the neighborhood witness, but that he had included everything from his notes in
the police report provided during discovery.  (D.I. 14-2 at 21-22).  This record demonstrates that
the State did not suppress information about "Boyer" as a possible suspect.

Additionally, Petitioner cannot demonstrate any prejudice caused by the absence of
Trooper Murray's notes or the absence of advance notice of Detective Doughty's email.  Trooper
Murray's notes were reduced to writing in his police report, and he testified to this effect during
Petitioner's trial.  (D.I. 14-6 at 59-60, 62).  Trial counsel also questioned Detective Doughty about
the email regarding the "Boyer" matter during Petitioner's trial.  (D.I. 14-13 at 33-35).  The jury
was aware of the destroyed notes, the email communication, and the possibility of another suspect
named Boyer, or Kevin Boyer.  And, as both Delaware courts found: (1) Petitioner admitted in his
interview with Doughty that he was at the trailer, drove Lessig's vehicle, and abandoned the
vehicle; and (2) both Lessig and his grandson described Petitioner in similar terms and identified

him out of a six-photo lineup.  In sum, Petitioner has failed to demonstrate a reasonable probability of a different outcome so as to undermine confidence in the verdict.

Based on the foregoing, the Court concludes that the Delaware Supreme Court's denial of Claim Two was neither contrary to, nor an unreasonable application of, *Brady*.  Accordingly, the Court will deny Claim Two.

### C.      Claim Three: Improper Admission of Petitioner's Videotaped Interview

During its direct examination of Detective Doughty, the State proffered Doughty's November 25, 2016 recorded interview of Petitioner.  (D.I. 14-13 at 320).  Trial counsel responded, "That is without objection, Your Honor."  (*Id*.).  After playing the video of the interview for the jury, the State asked Detective Doughty if Petitioner's version of events was consistent with Lessig's version, and then asked him to explain the consistencies and inconsistencies.  (*Id*. at 321-22).  Trial counsel objected, noting that the witness could not offer an inadmissible opinion.  (*Id*. at 322).  The trial court agreed, noting that "Giving his opinion in the difference of what the defendant said and Mr. Lessig said, that is for the jury to determine as far as credibility and conflicts in the testimony."  (D.I. 14-13 at 322).  The trial court sustained Petitioner's objection and instructed the jury that it was their "duty and responsibility to determine the facts from what people said" and to try to resolve any contradictions in the testimony.  (*Id.*).  On cross-examination, Petitioner questioned the detective about some of the remarks and questions he made during the interview.  (*Id*. at 329-30).

On direct appeal, Petitioner argued "that the introduction of Doughty's comments on the video recording of [Petitioner's] police interrogation – in which Doughty told [Petitioner] that he was an advocate for Lessig and that he believed Lessig – amounted to impermissible vouching."  *Pumphrey*, 2019 WL 507672, at *6.  Applying well-settled Delaware law – *Stevenson v. State*, 149

A.3d 505 (Del. 2016) – the  Delaware Supreme Court determined that the claim was waived

because Petitioner

> offered no objection to admitting the interrogation
> video into evidence. Instead, his counsel informed
> the court, "[t]hat is without objection, Your Honor."
> Yet, immediately afterwards, when the State asked
> the detective to "explain the consistencies and
> inconsistencies" between the differing versions of
> the witnesses' accounts, Pumphrey's counsel
> objected. The trial court sustained Pumphrey's
> objection, and instructed the jury that it is their "duty
> and responsibility to determine the facts" and resolve
> contradictions in testimony. Based upon the record
> before us, we conclude that Pumphre''s argument has
> been waived.

*Pumphrey*, 2019 WL 507672, at *4.

By applying *Stevenson* and finding that Petitioner waived his argument, the Delaware

Supreme Court articulated a plain statement that its decision rested on an independent and adequate

state law ground precluding habeas review.  *See Harris v. Reed*, 489 U.S. 255 (1989).

Consequently, the Court cannot review the merits of Claim Three absent a showing of cause for,

and prejudice resulting from, the default, or a showing that refusing to review the merits will result

in a miscarriage of justice.

The Court views the ineffective assistance of counsel argument in Claim Four – that trial

counsel was ineffective for failing to object to the admission of the videotape or was ineffective

for failing to request redaction of the alleged vouching by Doughty – as Petitioner's attempt to

establish cause.  An attorney's actions or inactions can constitute cause for a default only if those

actions/inactions amount to constitutionally ineffective assistance.  *See Murray*, 477 U.S. at 488-

89.  As explained later in the Opinion, the Court concludes that trial counsel's failure to object to

the admission of the videotaped interview or counsel's failure to request the redaction of

Doughty's comments does not amount to ineffective assistance. *See infra* at Section III.D.1. Thus, Petitioner has failed to demonstrate cause.

In the absence of cause, the Court need not address the issue of prejudice. Additionally, Petitioner has failed to show that the miscarriage of justice exception to the default doctrine applies because he has failed to provide new reliable evidence of his actual innocence.

Accordingly, the Court will deny Claim Three as procedurally barred.

### D. Claims Four, Five, and Six: Ineffective Assistance of Counsel Claims Adjudicated on the Merits

Petitioner presented the ineffective assistance of counsel allegations in Claims Four, Five, and Six to the Superior Court in his amended Rule 61 motion. The Superior Court denied the Claims as meritless, and the Delaware Supreme Court affirmed that decision "on the basis of and for the reasons stated in [the Superior Court's] October 19, 2020 Order." *Pumphrey*, 2021 WL 1997957, at *1. Given these circumstances, Petitioner will only be entitled to relief if the Superior Court's decision was either contrary to, or an unreasonable application of, *Strickland*.[4]

Turning to the first prong of the § 2254(d)(1) inquiry in this proceeding, the Court notes that the Superior Court correctly cited and articulated the *Strickland* standard to be applied in Petitioner's case. *See Pumphrey*, 2020 WL 6132294, at *5-6; *Williams*, 529 U.S. at 406 ("[A] run-of-the-mill state-court decision applying the correct legal rule from [Supreme Court] cases to the facts of a prisoner's case [does] not fit comfortably within § 2254(d)(1)'s 'contrary to' clause").

---

[4]     The Superior Court's denial of Claims Four, Five, and Six is the last state court decision containing a reasoned analysis. Consequently, the Court references the Superior Court's decision when analyzing the IATC arguments in those Claims under § 2254(d). *See Wilson v. Sellers*, 584 U.S. 122, 128 (2018) (reiterating that when a higher court affirms a lower court's judgment without an opinion or other explanation, federal habeas law employs a "look through" presumption and assumes that the later unexplained order upholding a lower court's reasoned judgment rests upon the same grounds as the lower court judgment).

The Court must also determine if the Superior Court reasonably applied the *Strickland* standard to the facts of Petitioner's case. *See Harrington*, 562 U.S. at 105-06. When performing this inquiry, the Court must review the Superior Court's denial of Petitioner's IATC allegation through a "doubly deferential" lens. *Id.* "[T]he question is not whether counsel's actions were reasonable, [but rather], whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* When assessing prejudice under *Strickland*, the question is "whether it is reasonably likely the result would have been different" but for counsel's performance, and the "likelihood of a different result must be substantial, not just conceivable." *Id.* And finally, when viewing a state court's determination that a *Strickland* claim lacks merit through the lens of § 2254(d), federal habeas relief is precluded "so long as fairminded jurists could disagree on the correctness of the state court's decision." *Id.* at 101.

### 1.    Claim Four: Trial Counsel Failed to Seek Redactions or Object to Petitioner's Videotaped Police Interview

According to Petitioner, throughout his videotaped interview with the police, Detective Doughty "told [Petitioner] that he [Doughty] did not believe him [Petitioner], that he believed Mr. Lessing, and he was an advocate for the victim." (D.I. 14-14 at 301). Petitioner asserts that Detective Doughty's statements constituted impermissible vouching and alleges that trial counsel provided ineffective assistance by: (1) failing to request that Detective Doughty's "vouching" statements be redacted from his videotaped police interview; or (2) failing to object to the admission of Detective Doughty's "improper testimony." (D.I. 4 at 4-6).

The Superior Court rejected the ineffective assistance allegation in Claim Four after determining that Petitioner failed to satisfy both prongs of the *Strickland* standard. The Superior Court found that trial counsel did not perform deficiently under *Strickland*'s first prong after

reviewing trial counsel's Rule 61 affidavit and the state court records demonstrating how trial

counsel dealt with the introduction of Petitioner's videotaped police interview, explaining:

> In responding to this claim, Trial Counsel states that "[Petitioner] advocated for this very strategy in order to advance the defense theory of sloppy and misleading police work in order to receive the benefit of a jury instruction on the lesser included offense of Unauthorized Use of a Motor Vehicle ('UUMV')." The defense theory was that Petitioner "borrowed" the car on a different date, and thus there must be a third person ("Boyer") who committed the carjacking on the date in question. Although the jury was given the UUMV instruction, it chose not to accept the defense theory, and found Petitioner guilty of Carjacking Second Degree.
>
> In support of this theory, the Superior Court Judge presiding over the trial "found that trial counsel . . . effectively argued to the jury that there was another suspect that the police decided not to pursue."
>
> The Delaware Supreme Court addressed Petitioner's contention that the introduction of the detective's comments during Petitioner's police interrogation constituted improper vouching. In Petitioner's direct appeal, the Supreme Court found that Petitioner's argument had been waived. The Supreme Court found that Trial Counsel offered no objection to admitting the interrogation video into evidence, yet objected immediately afterwards when the State asked the detective to "explain the consistencies and inconsistencies" between the differing versions of the witnesses' accounts. The trial court sustained Petitioner's objection, and instructed the jury that it is their "duty and responsibility to determine the facts" and resolve contradictions in testimony." The Supreme Court noted that Trial Counsel also proposed redactions of other interviews, but not of Petitioner's interview, suggesting that Petitioner strategically chose not to redact the vouching. Therefore, the Supreme Court found that Petitioner's argument had been waived.
>
> Taking all of this into consideration, it is clear to me that Trial Counsel made a strategic decision to not seek redactions of Petitioner's police interview in order to argue that the police, in his opinion, did not complete a full investigation before deciding that

Petitioner was the culprit. In my view, Trial Counsel's strategic decision was reasonable.

*Pumphrey*, 2020 WL 6132294, at *6.

After reviewing the record, the Court finds that the Superior Court reasonably determined the facts in concluding that trial counsel made a strategic decision in not objecting to Detective Doughty's statements or in not moving to redact Detective Doughty's statements. In his Rule 61 affidavit, trial counsel explains that Doughty's

> language, together with the DSP [Delaware State Police] mistakes in the investigation and [Petitioner's] calm demeanor on the video make for a compelling argument that the DSP detective made up his mind early on that [Petitioner] was the only suspect despite overwhelming holes in the DSP theory. [. . .] Here, the Doughty-[Petitioner] exchange is intended as a credibility test of the police work, or the lack thereof, against [Petitioner's] lengthy explanation to the police concerning his actions. Ultimately the jury chose to believe Lessig's story over [Petitioner's] UUMV explanation but that was not for lack of challenge to the State's case by the defense and conformed exactly with his desire to get a UUMV instruction.

(D.I. 14-14 at 319-20). As the Delaware Supreme Court noted on direct appeal, and the Superior Court noted in Petitioner's Rule 61 proceeding, trial counsel's act of objecting to certain interviews and seeking redactions of certain interviews when not objecting to or seeking any redactions of Petitioner's recorded interview indicates that trial counsel had a strategic reason for his actions concerning Petitioner's interview. Viewing trial counsel's "failure" to object to or seek any redactions of Petitioner's recorded interview in context with trial counsel's Rule 61 affidavit demonstrates the reasonableness of the Superior Court's determination that trial counsel strategically decided not to seek the redaction of Detective Doughty's statements from Petitioner's recorded police interview in order to advance the defense theory that the police failed to pursue a potential suspect. In sum, viewing the Superior Court decision under a "doubly deferential" lens, as it must, the Court cannot find that the Superior Court unreasonably applied *Strickland* in

concluding that trial counsel did not perform deficiently by not objecting to the admission of Petitioner's recorded police interview or by not moving to redact Detective Doughty's alleged "vouching statements" from that interview.

In addition, the Court finds that the Superior Court reasonably applied *Strickland* when finding Petitioner did not demonstrate "that there exists a reasonable probability that, but for Trial Counsel's alleged errors, the outcome of the trial would have been different." *Pumphrey*, 2020 WL 6132294, at *6. Petitioner contends he was prejudiced by trial counsel's actions because the comments "may induce the jury to trust the State's judgment rather than its own view of the evidence." (D.I. 4 at 6). Yet, Petitioner ignores the evidence presented at trial, trial counsel's objection related to Petitioner's recorded interview, and the jury instructions. For instance, after the State introduced Petitioner's recorded interview into evidence, the following exchange took place:

> STATE: So at this point in time you had spoken with Mr. Lessig already and you have now spoken with [Petitioner]. Was [Petitioner's] version of events consistent with Mr. Lessing?
>
> DOUGHTY: To a degree.
>
> STATE: Can you explain the consistencies and inconsistencies?
>
> DOUGHTY: Yes. So I had taken . . .

(D.I. 14-13 at 321-22)

At that point, trial counsel objected:

> T. COUNSEL: Under 701, the witness's purported testimony would be okay. If he's going to give an opinion, that would be up to the finder of fact, so I would fact, so I would object. This is not within the span of what he's testifying to.

The Superior Court sustained Petitioner's objection, stating:

> COURT:    Giving his opinion in the difference of what [Petitioner] said and what Mr. Lessig said, that is for the jury to determine as far as credibility and conflicts in testimony.

(D.I. 14-13 at 322).

The Superior Court then gave the following cautionary instruction to the jury:

> Ladies and gentlemen of the jury, it is your duty and responsibility to determine the facts from what people said and if what they said there are contradictions in the testimony and try to resolve those. So asking another witness to explain what they think the contradictions are is taking over your responsibilities. So that question will not be allowed.

(D.I. 14-13 at 323-24).

At the close of evidence, the trial judge gave the following jury instruction:

> Now, you are the sole judges of the credibility of each person who has testified and the weight to be given to the testimony of each. You are to judge the credibility of all the witnesses that have testified before you, whether for the prosecution or defense. If you should find the evidence of the witnesses to be conflicting, you should try to make one harmonious story of it all; however, if you cannot do so, it is your privilege as the judges of the facts to accept that part of the testimony you find is more credible and to reject any part which, in your judgment, is unworthy of credit.

(D.I. 14-13 at 406-07).

The Court must presume that the jury followed the trial court's instructions regarding what they should and should not consider. *See Greer v. Miller*, 483 U.S. 756, 766 n. 8 (1987) ("We normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an overwhelming probability that the jury will be unable to follow the court's instructions."). In this case, the Superior Court's multiple jury instructions removed any danger of prejudice to Petitioner. And, after considering the multiple jury instructions in conjunction with the substantial identification evidence presented at trial, the

Court finds that Petitioner cannot demonstrate a reasonable probability that the result of his trial would have been different but for trial counsel's decision not to object to the admission of the recorded interview or counsel's decision not to seek to redact Doughty's statements from Petitioner's recorded interview. Thus, Petitioner has failed to satisfy the prejudice prong of the *Strickland* test.

Accordingly, the Court will deny Claim Four for failing to satisfy § 2254(d).

2.    **Claim Five: Trial Counsel Revealed Petitioner's Criminal Record**

In Claim Five, Petitioner asserts that trial counsel provided ineffective assistance by referring to Petitioner's criminal history during opening statements, and by referencing a "mugshot" and "major case prints" while cross-examining the State's witnesses. (D.I. 14-14 at 304-05). Petitioner contends that trial counsel failed to subject the State's case to adversarial testing by repeating that "Petitioner was a convicted felon over and over again," and appears to assert that  prejudice should be presumed under *United States v. Cronic*, 466 U.S. 668 (1984). (D.I. 4 at 7).

The Superior Court denied Claim Five after finding trial counsel pursued a reasonable strategic decision to admit that Petitioner had a criminal record and that his fingerprints were in the system because it "highlight[ed] that [Petitioner's] fingerprints were not found in Lessig's car." *Pumphrey*, 2020 WL 6132294, at *7. The record supports the Superior Court's decision. Trial counsel made each of the references (Petitioner's criminal history, his major case prints, and his mugshot) in order to advance the defense theories that the police mishandled the investigation and that there was no physical or forensic evidence tying Petitioner to the crime. (*See* D.I. 14-13 at 129, 306-10, 336-37). Notably, trial counsel did not reference any prior convictions for particular offenses, and Petitioner's criminal history was not introduced into evidence. Trial counsel's question about a "major case file" and use of the term "mugshot" did not reference any particular

27

charge or prior arrest – in fact, the question about the major case file was withdrawn and never answered.

When viewed in context, trial counsel's passing references to Petitioner's criminal history were tied to the lack of fingerprint evidence linking him to crime in the instant case, and counsel's use of the term "mugshot" highlighted the fact that Lessig's description of the man who took his car was inconsistent with Petitioner's appearance in the photo array. Thus, looking through the doubly deferential lens applicable to IATC claims on federal habeas review, the Court finds that the Superior Court reasonably applied *Strickland* to the facts of Petitioner's case when concluding that trial counsel's references to Petitioner's criminal history did not constitute deficient performance.

In turn, the Court finds that the Superior Court reasonably applied *Strickland* when determining that Petitioner failed to demonstrate prejudice. As an initial matter, the Court rejects Petitioner's implicit contention that prejudice should be presumed under *Cronic*, because the record clearly demonstrates that this case is not one where trial counsel has completely failed to test the prosecution's case throughout the entire proceeding. The Court also finds that Petitioner has failed to demonstrate prejudice under *Strickland*, because he does not assert any concrete allegation of prejudice. The jury heard Petitioner's admissions to the police and the witnesses' identification testimony, and nothing in the record suggests that trial counsel's statements about Petitioner's criminal history during opening argument and on cross-examination influenced the jury's decision.

Accordingly, the Court will deny Claim Five for failing to satisfy § 2254(d).

### 3.    Claim Six:  Trial Counsel's Unreasonable Trial Strategy

In Claim Six, Petitioner contends that: (a) given the evidence, trial counsel pursued an unreasonable trial strategy (D.I. 2 at 6); and (b) trial counsel pursued  an unreasonable strategy by

"admitt[ing] Petitioner [] got away with being guilty for past wrongs" (D.I. 4 at 8). Claim Six (b) essentially reasserts the argument from Claim Five about trial counsel's references to Petitioner's criminal history. Consequently, the Court rejects Claim Six (b) for the same reasons discussed with respect to Claim Five. *See supra* at Section III.D.2.

Turning to Claim Six (a), the Court notes that the argument asserted therein mirrors the argument Petitioner presented in his Rule 61 motion: in general, trial counsel's overall trial strategy was professionally unreasonable. (D.I. 14-14 at 308-12). In his Rule 61 affidavit response to Petitioner's IATC claims, trial counsel explains that he consulted Petitioner about the defense strategy and they both agreed upon a strategy of attacking the police investigation and trying to convince the jury that he was only guilty of the unauthorized use of a motor vehicle, not carjacking. (D.I. 14-14 at 316-17). Petitioner submitted an affidavit in rebuttal, stating he did not direct trial counsel "to pursue any particular strategy, including a trial strategy of attempting to obtain a conviction for a lesser included offense." (*Id*. at 360-61). The Superior Court found that Petitioner failed to demonstrate prejudice and also failed "overcome the *Strickland* presumption that Trial Counsel used a reasonable trial strategy." *Pumphrey*, 2020 WL 6132294, at *7. For the following reasons, the Court concludes that the Superior Court did not unreasonably apply *Strickland* in denying Claim Six (a).

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 690–91.  As demonstrated by the record and trial counsel's Rule 61 affidavit, the defense theory was multi-faceted.  Trial counsel challenged the police investigation by highlighting a lack of physical evidence and the detective's sole focus on Petitioner as the perpetrator, which foreclosed further police investigation into alternative suspects or versions of events.  Trial counsel also sought to discredit the victim in order to pursue the theory that Petitioner borrowed the car.  Viewed together, trial counsel presented a global reasonable doubt defense that provided the jury with several alternatives for concluding that the State failed to meet its burden.  The fact that Petitioner in hindsight disagrees with that strategy does not render trial counsel's strategic decisions professionally unreasonable.

Petitioner has also failed to demonstrate prejudice.  Petitioner presented the theory that Petitioner just "borrowed" Lessig's car, and the jury rejected it.  In this proceeding, Petitioner does not present any evidence demonstrating a reasonable probability that the outcome of his trial would have been different but for trial counsel's failure to pursue a different defense theory.

Thus, the Court will deny Claim Six for failing to satisfy §2254(d).

### E.    Claims Seven, Eight and Nine: Procedurally Barred Ineffective Assistance of Counsel Claims

In Claim Seven, Petitioner contends that trial counsel provided ineffective assistance by not challenging the suggestive pre-trial identification.  (D.I. 4 at 3).  In Claim Eight, he asserts trial counsel provided ineffective assistance by not challenging the pre-trial identification and reference to "Boyer" as a suspect.  (D.I. 4 at 3).  And, in Claim Nine, he contends that appellate and postconviction counsel provided ineffective assistance by failing to raise a conflict of interest claim regarding trial counsel's representation.  (D.I. 4 at 11-14).

As an initial matter, the Court notes that the ineffective assistance of post-conviction counsel argument in Claim Nine fails to assert an issue cognizable on federal habeas review.  *See*

28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254").  Therefore, from this point forward, the Court's reference to Claim Nine is to the ineffective assistance of appellate counsel argument raised therein.

Turning back to Petitioner's remaining ineffective assistance of counsel arguments, the proper procedural vehicle for raising ineffective assistance of counsel claims in the Delaware state courts is a post-conviction motion filed pursuant to Delaware Superior Court Criminal Rule 61. *See Buchanan v. Johnson*, 723 F. Supp. 2d 722, 725 (D. Del. 2010).  The record reveals that Claims Seven, Eight, and the ineffective assistance of appellate counsel argument in Claim Nine are unexhausted because Petitioner did not include the three Claims in his Rule 61 motion to the Superior Court or on post-conviction appeal.  At this juncture, any attempt by Petitioner to present these three Claims in a new Rule 61 motion would be time-barred under Rule 61(i)(1).  *See DeAngelo v. Johnson*, 2014 WL 4079357, at *12 (D. Del. Aug. 15, 2014).  Although Rule 61(i)(1) provides for an exception to the one-year time limitation if the untimely Rule 61 motion "asserts a retroactively applicable right that is newly recognized after the judgment of conviction is final," no such right is implicated in the instant ineffective assistance of counsel arguments.  Similarly, the exceptions to Rule 61(i)(1)'s time-bar contained in Rule 61(i)(5) and (d)(2) do not apply to Petitioner's case, because he does not allege actual innocence, lack of jurisdiction, or that a new rule of constitutional law applies to the instant arguments.  Given these circumstances, the Court must treat the instant three ineffective assistance of counsel Claims as procedurally defaulted, meaning that the Court cannot review the merits of their arguments absent a showing of cause-and-prejudice or a miscarriage of justice.

Petitioner contends that cause has been established pursuant to *Martinez v. Ryan*, 566 U.S. 1, 8-9 (2012) because post-conviction counsel failed to include Claims Seven, Eight, and Nine in his Rule 61 motion. In *Martinez,* the Supreme Court held for the first time that inadequate assistance or the absence of counsel during an initial-review state collateral proceeding may establish cause for a petitioner's procedural default of a claim of ineffective assistance of trial counsel. *Id*. at 12, 16-17. In order to obtain relief under *Martinez*, Petitioner must demonstrate that post-conviction counsel provided ineffective assistance by failing to include Claims Seven, Eight, and Nine in his Rule 61 motion, that the underlying ineffective assistance of trial counsel claims are substantial, and that Petitioner was prejudiced. *Id*. at 14-17. A substantial ineffective assistance of trial counsel claim is one that has some merit which, given the *Martinez* Court's citation to *Miller-El v. Cockrell*, 537 U.S. 322 (2003), appears to be governed by the standards applicable to certificates of appealability. *Id*. at 13.

Petitioner's attempt to establish cause is unavailing. As previously discussed, the Court finds that the Delaware Supreme Court reasonably applied clearly established federal law in rejecting the substantive identification and *Brady* arguments related to the ineffective assistance of trial counsel arguments in Claims Seven and Eight. *See supra* at Section III. A & B. This determination demonstrates that the related ineffective assistance of counsel arguments are not substantial which, in turn, precludes establishing cause for Claims Seven and Eight under *Martinez*. In turn, *Martinez* does not provide a method for establishing cause for Petitioner's default of the ineffective assistance of appellate counsel argument in Claim Nine, because *Martinez* only applies to claims alleging ineffective assistance of trial counsel. *See Davila v. Davis*, 582 U.S. 521, 521 (2017) ("declining to expand the *Martinez* exception to the distinct context of ineffective assistance of appellate counsel").

Given Petitioner's failure to establish cause, the Court will not address the issue of prejudice. Additionally, Petitioner has failed to show that the miscarriage of justice exception to the default doctrine applies because he has failed to provide new reliable evidence of his actual innocence.

Based on the foregoing, the Court will deny Claims Seven, Eight, and Nine as procedurally barred from habeas review.

### F.    Claim Ten: Cumulative Error

In his final Claim, Petitioner asserts that the cumulative error of trial counsel's alleged errors prejudiced him and, therefore, warrant federal habeas relief. Petitioner presented the same "cumulative error" argument in his Rule 61 motion to the Superior Court, which denied the argument as meritless. Therefore, Claim Ten will only warrant habeas relief if the Delaware Supreme Court's decision was either contrary to, or an unreasonable application of, clearly established federal law.

The United States Supreme Court has not recognized the concept of cumulative error. *See Bush v. Carpenter*, 926 F.3d 644, 686 n.16 (10th Cir. 2019). Since there is no clearly established Federal law with respect to a cumulative error argument, it would appear that the Court's § 2254(d) analysis is over and Petitioner is not entitled to habeas relief for Claim Ten.

Nevertheless, the Third Circuit has recognized the cumulative error doctrine on habeas review, holding that "a cumulative error argument constitutes a stand-alone constitutional claim subject to exhaustion and procedural default." *Collins v. Sec'y of Pa. Dep't of Corr.* 742 F.3d 528, 542 (3d Cir. 2014). Pursuant to the cumulative error doctrine,

> [i]ndividual errors that do not entitle a petitioner to relief may do so when combined, if cumulatively the prejudice resulting from them undermined the fundamental fairness of his trial and denied him his constitutional right to due process. Cumulative errors are not harmless if they had a substantial and injurious effect or influence

> in determining the jury's verdict, which means that a habeas petitioner is not entitled to relief based on cumulative errors unless he can establish actual prejudice.

*Fahy,* 516 F.3d at 205. Given the Third Circuit's recognition of the cumulative error doctrine in habeas proceedings, the Court will exercise prudence and review Claim Ten.

Here, Petitioner presented the same "cumulative error" argument in his Rule 61 motion to the Superior Court, which denied the argument as meritless. Therefore, Claim Ten will only warrant habeas relief if the Delaware Supreme Court's decision was either contrary to, or an unreasonable application of, clearly established federal law.

The Superior Court reviewed and rejected each alleged underlying error on its merits, and also rejected Petitioner's cumulative error argument because "the evidence against Petitioner was found by the trial judge to be 'significantly overwhelming.'" *Pumphrey*, 2020 WL 6132294, at *8. As previously discussed, this Court has concluded that Claims One, Two, Four, Five, and Six lack merit, and that declining to review the merits of procedurally barred Claims Three, Seven, Eight, and Nine will not prejudice Petitioner. Therefore, the Court will deny Claim Ten as meritless.

## IV.    CERTIFICATE OF APPEALABILITY

A district court issuing a final order denying a § 2254 petition must also decide whether to issue a certificate of appealability. *See* 3d Cir. L.A.R. 22.2 (2011); 28 U.S.C. § 2253(c)(2). A certificate of appealability is appropriate when a petitioner makes a "substantial showing of the denial of a constitutional right" by demonstrating "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." 28 U.S.C. § 2253(c)(2); *see also Slack v. McDaniel*, 529 U.S. 473, 484 (2000). In addition, when a district court denies a habeas petition on procedural grounds without reaching the underlying constitutional claims, the court is not required to issue a certificate of appealability unless the petitioner demonstrates that jurists of reason would find it debatable: (1) whether the petition states a valid claim of the denial

34

of a constitutional right; and (2) whether the court was correct in its procedural ruling. *See Slack,* 529 U.S. at 484.

The Court has concluded that the instant Petition does not warrant relief. Reasonable jurists would not find this conclusion to be debatable. Accordingly, the Court will not issue a certificate of appealability in this case.

## V.    <u>CONCLUSION</u>

For the reasons discussed, the Court will deny the instant Petition without issuing a certificate of appealability or holding an evidentiary hearing. The Court will enter an Order consistent with this consistent with this Memorandum Opinion.